IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOSHUA DUSTIN HORSLEY,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:26-cv-0479<br><br>DISTRICT JUDGE BRIDGET MEEHAN BRENNAN<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Joshua Dustin Horsley filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying his applications for disability insurance benefits and supplemental security income. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural background**

In January 2023, Horsley protectively filed applications for disability insurance benefits and supplemental security income.[1] Tr. 17, 392. He initially

---

[1] A "protective filing date" is the first time a claimant contacts the Social Security Administration about filing for benefits. *See Glossary of Social Security Terms*, Social Security, http:// www.ssa.gov/glossary.htm (last visited Aug. 19, 2026). It allows the claimant to have an application date earlier than

alleged a disability onset date of June 1, 2017,[2] Tr. 241, 392, but later amended it to February 3, 2022, *see* Tr. 18, 58. Horsley also claimed that he was disabled and limited in his ability to work due to: epilepsy, depression, anxiety, insomnia, tinnitus, carpal tunnel syndrome, atherosclerosis,[3] chronic obstructive pulmonary disease, unspecified "heart conditions," and numbness in his right leg. *See* Tr. 323. The Commissioner, however, denied Horsley's applications initially, Tr. 137, 140, and on reconsideration, Tr. 145, 149.

Horsley requested a hearing before an administrative law judge (ALJ). Tr. 152. In April 2025, an ALJ held a telephonic hearing. Tr. 41. Horsley appeared, testified, and was represented by counsel. Tr. 41, 47–60. Qualified vocational expert Carrie Anderson also testified. Tr. 60–63. In May 2025, the ALJ issued a written decision finding that Horsley was not entitled to benefits. *See* Tr. 17–34. The Appeals Council declined further review, making the ALJ's decision final. Tr. 1; *see* 20 C.F.R. § 404.981.

---

the date the Social Security Administration receives the claimant's signed application. *Id.*; *see Slaughter v. Astrue*, No. 3:09-cv-233, 2010 WL 3909364, at *1 n.2 (S.D. Ohio Mar. 31, 2010). Here, Horsley did not actually file his supplemental security income application until February 2023. *See* Tr. 251.

[2] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 22, 425 (6th Cir. 2006).

[3] Atherosclerosis is a disease in which plaques build up inside arteries. *See* Dorland's Illustrated Medical Dictionary, at 169 (33d. ed. 2020); *What is Atherosclerosis?*, National Heart, Lung, and Blood Institute, https://www.nhlbi.nih.gov/health/atherosclerosis (last updated October 28, 2024).

Horsley timely filed this action in February 2026. Doc. 1. In it, he presents the following issue for review:

> Did the Administrative Law Judge (ALJ) commit errors at step four in evaluating subjective complaints, and subsequently in crafting the residual functional capacity (RFC).[4]

Doc. 8, at 1.

**Evidence**[5]

*Personal and Vocational Evidence*

Horsley was born in 1982, making him 40 years of age at the time of his disability onset. *See, e.g.*, Tr. 124. He has a GED, Tr. 324, and no relevant past work experience, Tr. 32; *see also* Tr. 311. He was insured through September 30, 2022.[6] Tr. 94.

---

4 A residual functional capacity (RFC) is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

5 The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

6 To receive disability insurance benefits under Title II of the Social Security Act, an eligible claimant must establish disability on or before the date last insured. *See* 20 C.F.R. §§ 404.101, 404.130–31; *Savage v. Comm'r of Soc. Sec.*, 5:25-cv-762, 2025 WL 3484738, at *6 n.4 (N.D. Ohio Dec. 4, 2025); *see also Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

*Medical Evidence*[7]

Horsley had a history of seizures dating to 2016 and had taken Keppra, a prescribed medication. *See* Tr. 406, 420, 442. In addition to seizures, providers diagnosed him with alcohol abuse, adjustment disorder, depression, and insomnia. Tr. 442. According to Horsley's neurologist, Horsley acknowledged that his seizures often occurred "in the setting of alcohol intoxication." Tr. 420.

In September 2022, Horsley presented to the emergency department after he lost consciousness, fell, and hit his head. Tr. 442. Horsley reported "some pain in the back of his head." Tr. 442. A head CT scan showed volume loss in the left anterior MCA region greater than expected for Horsley's age, but also showed no acute intracranial abnormalities or skull fractures. Tr. 446. Later that month, Horsley reported to his neurologist that he had "cut back on his drinking" to "only … [three] beers spread out over the weekend." Tr. 420. The neurologist observed that Horsley was awake, alert, and oriented, displaying normal attention and memory, Tr. 422, and kept him on Keppra. Tr. 423.

---

[7] As the Commissioner points out, Horsley does not challenge the ALJ's findings regarding his physical limitations. *See* Doc. 8, at 10–11; Doc. 10, at 2. Accordingly, the Court summarizes and discusses medical evidence only as to Horsley's mental health. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("[W]e limit our consideration to the particular points that [the claimant] appears to raise in her brief on appeal.").

As noted, Horsley protectively filed his applications for disability insurance benefits and supplemental security income in January 2023. Tr. 244. Horsley then submitted a function report, Tr. 332–40, in which he stated that his epilepsy required 24-hour supervision, Tr. 336, and had kept him from working, Tr. 332, driving, Tr. 335, or performing "complex tasks," Tr. 334. He was "iffy" with written instructions and did not get along with authority figures. Tr. 338. Horsley also reported feeling suicidal, depressed, anxious, and fearing the "public or groups of people." Tr. 339. Horsley added that he took 14 medications a day, all of which "cause side effects." Tr. 340. Horsley, however, provided that he was "good" at following verbal instructions, Tr.338, and that he could perform various household chores, such as folding laundry, sweeping, mopping, and taking out trash. Tr. 334. Horsley enjoyed watching TV, fishing, camping, and engaging in "girlfriend boyfriend stuff." Tr. 337.

In March 2023, Horsley saw his primary care physician for anxiety, backpain, and chronic obstructive pulmonary disease. Tr. 1298. At the appointment, Horsley appeared "appropriately groomed," Tr. 1300, and reported improvement in his anxiety while taking Lexapro and Klonopin. Tr. 1298. Horsley's physician deemed Horsley's medication regimen "effective." Tr. 1300. During a neurologist visit days later, Horsley reported that he had suffered another seizure and lost consciousness until his brother found him in the bathroom. Tr. 416. Horsley maintained that he had "cut back on his drinking" and denied alcohol use at the time of the seizure. Tr. 416. In

response, the neurologist prescribed Keppra, gabapentin, and clonazepam. Tr. 416.

In April 2023, Horsley returned to the emergency department after a fist fight with a neighbor, who punched Horsley. Tr. 748. Horsley complained a "constant" chest pain, which he rated 3 out of 10 in severity. Tr. 748. Horsley admitted using methamphetamine the day before. Tr. 748. Although Horsley was alert and oriented to person, place, and time, Tr. 751, he left the emergency department against medical advice after initially agreeing to a plan of care. Tr. 753–54. His treating physician noted that Horsley had "the capacity to make medical decisions" and understood the risk of leaving against medical advice. Tr. 754. The same month, State Agency reviewers examined Horsley and assessed his physical RFC,[8] Tr. 103–05, but concluded that there was "insufficient evidence to substantiate the presence of a disorder" concerning Horsley's mental impairments, citing Horsley's non-response to requests for more information, Tr. 101. The reviewers later reconsidered Horsley's applications but still could not obtain Horsley's mental health information. Tr. 118.

---

8 When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether—and how much—the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

In June 2023, Horsley discussed his continuing anxiety and anger management issues with his primary care provider. Tr. 1263, 1265. Despite taking prescribed medications, Horsley reported persistent symptoms, including insomnia. Tr. 1263. Still, Horsley's provider observed that Horsley appeared "alert," "well appearing," and "in no acute distress." Tr. 1264. The following month, Horsley reported "some spells" and "problems with mood" to his neurologist, Tr. 1250, but the neurologist did not note any remarkable findings, Tr. 1252. Months later, Horsley returned to his primary care provider and reported improvement in his symptoms. Tr. 1133.

Horsley returned to the emergency department in March 2024 after he lost consciousness on his way to fishing. Tr. 1097. After EMS personnel and the police arrived, Horsley woke up and began running away until officers tackled him. Tr. 1097. At a hospital, Horsley claimed that "he just freaked out" when he woke up from his seizure. Tr. 1097. Although Horsley denied using any opiates and only admitted using marijuana, his belongings contained a methamphetamine pipe. Tr. 1097. Horsley returned home against medical advice that day, declining any examination. Tr. 1097.

In June 2024, Horsley reported hearing voices and having racing thoughts. Tr. 1078. He also experienced uncontrolled anxiety and insomnia, Tr. 1081, though he appeared appropriately groomed and denied side effects from his medications, Tr. 1079, 1081. Horsley's primary care provider adjusted Horsley's medication regimen to include Seroquel XR and Klonopin. Tr. 1081.

A month later, the police brought Horsley to the emergency department after his mother reported that Horsley had been "drinking all day" and "getting belligerent." Tr. 790. Officers tasered and handcuffed Horsley after he became "physical" with them. Tr. 790. At the emergency department, Horsley reported having passed out two days before and experiencing some light headedness when standing. Tr. 787.

In November 2024, the police again brought Horsley to the emergency department for a psychiatric evaluation after he displayed paranoia. Tr. 847, 867. Horsley also reported auditory and visual hallucinations, claiming "they put a chip in [his] head." Tr. 847. While Horsley had no prior psychosis diagnosis, his mother reported a pattern of similar psychotic episodes over the preceding six months. Tr. 867. On examination, Horsley showed limited insight and judgment, Tr. 896, but was alert and oriented, Tr. 889. Horsley stated that he engaged in fishing, kayaking, searching rocks, and taking care of his dog for leisure. Tr. 888. He admitted that he used methamphetamine four or five days before, smoked marijuana daily, and drank three six-packs of beer every week. Tr. 889. A physician diagnosed Horsley with acute psychosis, noting that his paranoia and delusions were likely related to methamphetamine use and exacerbated by neurological issues. Tr. 858. Before Horsley was discharged a few days later, Tr. 904, he repeatedly expressed frustration and was sedated due to agitated behavior. Tr. 899, 900. Horsley was prescribed Zyprexa on discharge. Tr. 904, 918.

In December 2024, Horsley visited a provider to establish outpatient psychiatric treatment. Tr. 1361. He reported "significant improvement" following his hospitalization, stating that he felt "calmer" and abstained from using methamphetamine or other substances. Tr. 1361. He also "expressed relief and gratitude for the complete resolution of his auditory and visual hallucinations." Tr. 1361. The provider likewise observed improved mood and insight, Tr. 1361, but noted that Horsley still "require[d] medication regimen adjustment for optimal management," prescribing olanzapine, trazodone, Lexapro, and gabapentin, Tr. 1364. At a follow-up appointment in January 2025, Horsley denied feeling nervous or anxious, Tr. 1332, but expressed concern about tinnitus, which he said began after he started Keppra. Tr. 1331.

*Hearing Testimony*

Horsley, who was represented by counsel, testified at the administrative hearing in April 2025. Tr. 41, 47–60. He was living with his mother in an apartment, Tr.47, and was unable to drive because of his epilepsy, Tr. 47–48. On a typical day, Horsley said that he would watch TV or "go down in the North Lake Park and fish for a few … hours." Tr. 50. When asked why he could not perform any simple work, Horsley responded that "it's … psychological." Tr. 52. Horsley explained that he heard voices and did not "like being around people," describing himself as "antisocial." Tr. 52. When Horsley heard voices "talking to [him] through the TV," Tr. 53, he would sit outside his house to avoid hearing them, Tr. 54. Although Horsley was taking Zyprexa for his

auditory hallucination, he still heard voices "every day." Tr. 53. He also experienced "ringing in [his] ears" but stopped taking medications and decided to "just deal with the ringing." Tr. 57.

Turning to his substance use, Horsley testified that he drank just "two or three beers a week." Tr. 53. He had also quit using methamphetamine about three months before, Tr. 52, but denied receiving any counseling or treatment for his substance abuse, Tr. 53. He admitted that before quitting, he used methamphetamine "pretty much … every day." Tr. 58. Horsley clarified that his methamphetamine use was not an attempt to self-medicate and was independent of his psychiatric symptoms. Tr. 58. Finally, Horsley acknowledged that he had no difficulty with "very limited interactions" with cashiers during routine errands. Tr. 53.

Qualified vocational expert, Carrie Anderson, also testified. Tr. 61–65. The ALJ asked Anderson whether a hypothetical individual of Horsley's age, education, and the RFC assessed could perform any work. Tr. 61–62. Anderson testified that hypothetical individual could perform multiple jobs in the national economy, including mail room clerk and inspector. Tr. 62–63. Anderson also testified that employers generally tolerate up to ten percent off-task time in addition to regular breaks, but they would not tolerate an employee missing work, arriving late, or leaving early more than one day per month or five days per year. Tr. 62.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2022.

2. The claimant has not engaged in substantial gainful activity since February 3, 2020, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: neuropathy; coronary artery disease, status-post remote myocardial infarction/stenting; degenerative disc disease of the lumbar spine; seizure disorder; anxiety disorder with insomnia; schizoaffective disorder; and a history of alcohol and substance use disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: the claimant can frequently stoop, kneel, crouch, and crawl; can frequently climb ramps and

stairs, but can never climb ladders, ropes, or scaffolds; can frequently reach in all directions with the right upper extremity; can frequently handle and finger with the bilateral upper extremities; can have occasional exposure to extreme cold, extreme heat, to concentrated wetness and/or humidity; cannot tolerate excessive exposure to atmospheric conditions as defined in the Selected Characteristics of Occupations (SCO); with no exposure to high, exposed places nor work in proximity to moving mechanical parts; nor drive or operate machines or equipment. The claimant can understand, remember, carry out simple instructions; can perform work without a specific production rate pace, such as an assembly line or hourly production quota; can have occasional interaction with coworkers, supervisors, and the general public; and can deal with occasional changes in a routine work setting. Furthermore, the claimant can work in settings with no more than a moderate noise level as defined in the SCO.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant … was 39 years old, which is defined as a younger individual age 18-49, on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past

relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 3, 2022, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 21–34.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ must follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of

impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has

made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice'" wherein the Commissioner can act without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

Horsley contends that the ALJ's RFC formulation was unsupported by substantial evidence because the ALJ "did not explain why he rejected [Horsley's] subjective complaints." Doc. 8, at 8. A claimant's subjective symptom complaints are among the evidence that an ALJ must consider in assessing the claimant's RFC at step four of the sequential analysis process. *See* 20 C.F.R. § 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability."). In turn, Social Security Ruling 16-3p requires the ALJ to undertake a two-step process to assess the limiting effects of a claimant's symptoms. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *3–4.[9] First, "the ALJ will ask whether … there is an underlying medically determinable physical impairment that could reasonably be expected to produce the claimant's symptoms." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (citing 20 C.F.R. § 416.929(a)); Soc. Sec. Ruling 16-3p, 2017 WL

---

[9] This two-step analysis was formerly referred to as a "credibility" determination in SSR 96-7p. SSR 16-3p removed the word "credibility" from its predecessor and refocused the ALJ's attention on the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *2 (SSA Oct. 25, 2017). Despite these changes, the procedures for reviewing an ALJ's assessment under SSR 16-3p are substantially the same as the procedures under SSR 96-7p. *See Delong v. Comm'r of Soc. Sec.*, No. 2:18-cv-368, 2019 WL 409364, *7-8 (S.D. Ohio, Feb. 1, 2019). The prior case law involving SSR 96-7p thus generally applies to the renamed "consistency determination" under SSR 16-3p. *Whicker-Smith v. Comm'r of Soc. Sec.*, No. 1:18-cv-52, 2019 WL 911084, at *5 (S.D. Ohio, Feb. 25, 2019), *report and recommendation adopted*, 2019 WL 1202361 (S.D. Ohio Mar. 14, 2019).

5180304, at *3. Next, "if … such an impairment exists," the ALJ "must evaluate the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Rogers*, 486 F.3d at 247; Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4.

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4; 20 C.F.R. § 404.1529(c)(4). A claimant's subjective symptom complaints may support a disability finding when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ, however, need not accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about her symptoms when the testimony is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Besides medical evidence, an ALJ should consider: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c)(3). "The ALJ need not analyze all seven factors, but

should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019).

In addition to these specific considerations that ALJs must examine, SSR 16-3p also requires ALJs to consider "the entire case record." 2017 WL 5180304, at *2. In conducting this analysis, "it is not sufficient for [the ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [the ALJ] simply to recite the factors described in the regulations for evaluating symptoms." *Id.* at *10.

Here, the ALJ followed SSR 16-3p in evaluating Horsley's complaints of mental health symptoms. First, the ALJ found that Horsley's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." Tr. 29. Moving to the next step, the ALJ found that Horsley's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Tr. 29. Although Horsley claims that the ALJ gave "no explanation in [his] decision," Doc. 8, at 9, the record contradicts this assertion. For instance, the ALJ explained that Horsley could interact with his medical providers, seek out and obtain treatments, care for his dog, and engage in various other activities including fishing, kayaking, and "girlfriend boyfriend stuff." Tr. 30 (citing Tr. 337, 888); *see* 20 C.F.R. § 404.1529(c)(3)(i) (requiring

ALJs to consider the claimant's daily activities in evaluating subjective symptoms). These activities go well beyond "minor daily activities such as watching television and preparing simple meals." *Rose v. Astrue*, No. 10-289-GWU, 2011 WL 1885399, at *6 (E.D. Ky. May 18, 2011). It is also reasonable for the ALJ to rely on Horsley's ability to perform "activities of daily living … in concluding that [Horsley] was not as limited as [he] had claimed." *Knapp v. Comm'r of Soc. Sec.*, No. 22-2055, 2023 WL 6800153, at *3 (6th Cir. Oct. 16, 2023) (per curiam).

Moreover, daily activities were not the sole basis for the ALJ's analysis, as the ALJ also weighed other relevant factors in determining that Horsley's symptoms were not disabling. *See Lawrence v. Comm'r of Soc. Sec.*, No. 1:21-cv-1691, 2023 WL 2246704, at *13 (N.D. Ohio Jan. 19, 2023). Regarding "[t]he location, duration, frequency, and intensity" of Horsley's complained symptoms, 20 C.F.R. § 404.1529(c)(3)(ii), the ALJ highlighted that Horsley had reported the "complete resolution of his auditory and visual hallucinations" by December 2024. *See* Tr. 30, 1361. The ALJ added that Horsley's symptoms improved "with medication compliance and substance use cessation," and were exacerbated "with relapse and medication non-compliance." Tr. 30; *see also* 20 C.F.R. § 404.1529(c)(3)(iii) (requiring the ALJ to consider "[p]recipitating and aggravating factors" for the claimant's pain). Turning to Horsley's medication regimen and treatment history, the ALJ observed that the record contained little treatment information outside of inpatient treatment for

methamphetamine use. Tr. 30; *see* 20 C.F.R. § 404.1529(c)(3)(iv)–(vi) (instructing ALJs to consider types of medications, treatments, and any other measures used to alleviate a claimant's symptoms). Finally, the ALJ pointed out that Horsley's mental status examinations "were consistently unremarkable." Tr. 30. Given the above, Horsley's claim that "the ALJ never applied the second step of the two-step analysis" under SSR 16-3p is meritless. Doc. 8, at 11.

Horsley maintains that his complained symptoms were "consistent with the objective medical and other evidence in the record," Tr. 8, at 10, but this argument fares no better. Even if the record contains *some* evidence supporting Horsley's subjective symptoms, ALJs "need not discuss every piece of evidence in the record." *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). Nor does an ALJ have to "make explicit credibility findings as to each bit of conflicting testimony, so long as his factual findings as a whole show that [the ALJ] implicitly resolved such conflicts." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) (citations and internal quotation marks omitted). Indeed, an ALJ's decision "is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). To the extent that Horsley invites the Court to reweigh the evidence and substitute its own

judgment for that of the ALJ, the Court should decline the invitation. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x. 411, 414 (6th Cir. 2011).

**Conclusion**

For all the reasons stated, I recommend that the District Court affirm the Commissioner's decision.

Dated: August 25, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).